1

1                 UNITED STATES DISTRICT COURT
             NORTHERN DISTRICT OF MISSISSIPPI
2                   GREENVILLE DIVISION

3

4 UNITED STATES OF AMERICA                PLAINTIFF

5 VS.                   NO. 4:17-CR-131-4

6 ANNETTE LOFTON                DEFENDANT

7

8                   ABORTED SENTENCING

9

10           BEFORE HONORABLE DEBRA M. BROWN
           UNITED STATES DISTRICT JUDGE
11

12             Greenville, Mississippi
             January 15, 2020
13

14 APPEARANCES:

15 For the Government:    CLAYTON A. (CLAY) DABBS, ESQUIRE
                  U.S. Attorney's Office
16                   900 Jefferson Avenue
                  Oxford, Mississippi 38655
17

18 For the Defendant:    WHITMAN D. MOUNGER, ESQUIRE
                  Whitman D. Mounger, Attorney
19                   P. O. Box 1123
                  Greenwood, MS 38930-1123
20

21

22 Court Reporter:       BRENDA D. BLACKBURN, RPR, CCR #1087
                  Federal Official Court Reporter
23                   305 Main Street
                  Greenville, Mississippi 38701
24

25

2

1                       (Convened:  2:00 P.M.)

2        **THE COURT:**  Good afternoon.  Be seated.

3        Call our next case.

4        **COURTROOM DEPUTY:**  The Court calls case number

5 4:17-CR-131-4, United States of America versus Annette

6 Lofton.

7        **THE COURT:**  We're here for the sentencing of the

8 defendant.

9        Who is here as counsel for the government?

10        **MR. DABBS:**  Clay Dabbs, Your Honor.

11        **THE COURT:**  And counsel for the defendant?

12        **MR. MOUNGER:**  Whitman Mounger, Your Honor.

13        **THE COURT:**  And our representative from probation?

14        **PROBATION OFFICER:**  Brandon Marlier, Your Honor.

15        **THE COURT:**  If the parties are prepared to proceed,

16 please come forward.

17        **MR. MOUNGER:**  Are you ready for her, Your Honor?

18        **THE COURT:**  Yes.  Come forward.

19        (Parties complied.)

20        **THE COURT:**  Good afternoon, Ms. Lofton.  Good

21 afternoon.

22        **MR. MOUNGER:**  I think she said good afternoon.

23        **THE DEFENDANT:**  Oh, good afternoon.  I'm sorry.

24        **THE COURT:**  Can you not hear me?

25        **THE DEFENDANT:**  I can hear you now.  I can't hear

3

1    too good with my right side.

2              **THE COURT:**  Okay.  I'll try to speak up.

3              You will be sentenced today for the crime of

4    conspiracy to commit healthcare fraud as it concerns your

5    operation of Zion Hospice.

6              I have reviewed the Presentence Investigation

7    Report and its addendum.  Have you had enough time to read

8    and review the Presentence Investigation Report and its

9    addendum and discuss them with your attorney --

10             **THE DEFENDANT:**  Yes.

11             **THE COURT:**  -- including any potential objections?

12             **THE DEFENDANT:**  Yes.  I've had time to read and

13   discuss it with him.

14             **THE COURT:**  Now, the Court is advised that there

15   were some objections.  The objections filing raised an

16   objection, paragraph 30, regarding an adjustment for the

17   role in the offense.  But I understand that is resolved,

18   correct?

19             **MR. MOUNGER:**  Yes, that's correct, Your Honor.

20             **THE COURT:**  And then the other objection was

21   withdrawn by the defendant.

22             **MR. MOUNGER:**  I think all objections have been

23   resolved.

24             **THE COURT:**  Okay.  Let me go back a little bit.

25             In addition, to the Presentence Investigation

4

1    Report, I've also reviewed the Sentencing Memorandum filed

2    by your attorney on your behalf.  And there were a number of

3    reference letters, one each from Andrea Burch, Tonya

4    Henderson, Jannette Williams, Karrington Lofton, Kimberly

5    Dye, Ray Sykes, Bertha Buchanan, Michael Stewart, Andy

6    Jones, and Myrical Taylor.

7              The Court also reviewed the defendant's position

8    with respect to the Presentence Investigation Report.  And I

9    take it that's the document where you raised the objections,

10   but all objections are either withdrawn or resolved.  Right,

11   Mr. Mounger?

12             **MR. MOUNGER:**  That's correct.

13             **THE COURT:**  Given that the objections have been

14   resolved or withdrawn, the Court adopts the Presentence

15   Investigation Report in full.

16             We're going to turn next to the Guidelines

17   applicable to your case, Ms. Lofton.  Your offense level is

18   21; your criminal history category is 1.  And this produces

19   the following guidelines ranges:  Imprisonment for 37 to 46

20   months, supervised release after imprisonment of one to

21   three years, a fine of 7,500 to $75,000; here, restitution

22   in the amount of $2,000,237 -- let me start over --

23   $2,237,509.  And then there's a special assessment of $100.

24             Under the guidelines you are ineligible for

25   probation.

1    Does any party disagree with the guidelines as

2  stated by the Court?

3    **MR. DABBS:**  No, Your Honor.

4    **MR. MOUNGER:**  No, Your Honor.

5    **THE COURT:**  For the next part of this proceeding,

6  the courtroom will be closed.  So anyone who's not a party,

7  counsel, or federal court staff, please leave the courtroom.

8  You will be permitted to return at some point later in the

9  proceeding.  And I'll ask our CSO to please monitor the

10  entrance to the courtroom to prevent anyone from entering.

11    **MR. DABBS:**  Your Honor, does that -- and I

12  apologize for not knowing this previously.  Does that

13  include the agents?  Do you want them to leave?  They

14  obviously know what's going on.  They're happy to leave if

15  you want them to.

16    **THE COURT:**  Does the defendant have an objection to

17  the agents remaining in the courtroom?

18    **MR. MOUNGER:**  I don't have an objection, Your

19  Honor.

20    **THE COURT:**  Okay.  Regardless, the courtroom is

21  formally closed; and the filing of the transcript of this

22  part of the proceeding, if not all, will be under seal.

23    (Courtroom cleared.)

24

25

6



















































15          (Courtroom reopened.)

16          **THE COURT:**  So we will proceed then.

17          Ms. Lofton, you may recall from your plea hearing I

18   advised you that if there was any statement you wished to

19   make to the Court, you would have the opportunity to do so

20   at your sentencing but you're not required to make a

21   statement.  I'm going to invite you to make that statement

22   shortly.

23          I first want to let you know what it is that the

24   Court will consider in determining your sentencing; and in

25   fact, what the Court is bound to consider in determining

1    your sentence.  There are certain statutory factors in that

2    regard.  The purpose is to make sure that the Court imposes

3    a sentence that is sufficient but not greater than necessary

4    to comply with the purposes of sentencing.  And I want to go

5    through these purposes with you to the extent that you may

6    want to remark about them when you have the opportunity to

7    speak to the Court, if you choose to do so.

8             Now, the purposes of sentencing include the need

9    for the sentence to reflect the seriousness of the crime, to

10   promote your respect for the law, and to provide just

11   punishment for the offense.  The sentence should also serve

12   the purpose of deterring criminal conduct, protecting the

13   public from future crime, and in particular, future crime by

14   you, and promote your rehabilitation, a very, very important

15   goal and purpose of sentencing.

16            The Court further then must consider the nature and

17   circumstances of your offense, your personal background,

18   history, and characteristics, the need to avoid unjustified

19   sentencing disparities among other defendants who find

20   themselves in your same situation, and the Court as well

21   would consider the types of sentencing available.

22            So I wanted to let you know what those things are

23   and what the Court has given thought to, and frankly, is

24   continuing to give thought to as we advance through this

25   proceeding.

33

1    So we've reached the time now, if there was

2 anything that you would like to say to the Court, please go

3 ahead.

4    **THE DEFENDANT:** Your Honor, I take full

5 responsibility, and I would like to apologize to everyone

6 that I've hurt, including my daughter, and I am deeply,

7 deeply sad that this happened.

8    **THE COURT:** All right.

9    Mr. Mounger.

10    **MR. MOUNGER:** Thank you, Your Honor.

11    Your Honor, with the best of intentions, my client,

12 Ms. Lofton, began this business, and at some point, she fell

13 astray. And she has admitted she did. She's pled guilty to

14 it, and she's trying to make it as right as possible by

15 cooperation with the government, her willingness to come

16 forward and testify, if need be. And I believe the Court

17 has recognized -- the government has stated that she has

18 provided substantial assistance, and that will be ongoing,

19 if needed.

20    Unfortunately, she's not much of a business person.

21 And in addition to making bad choices, making poor

22 judgments, and conducting herself in an inappropriate and

23 unlawful manner as it turns out, she was nonetheless unable

24 to acquire any great wealth out of this, so it would seem.

25 The financial condition of the defendant as reported in the

34

1     PSR shows that she has acquired next to nothing.  She has a

2     home that's considered unhabitable that she was hoping to

3     start renovating.  She is living in a mobile home, which she

4     had a tree fall on last week?  Two weeks ago?

5           **THE DEFENDANT:**  I think it got totaled.

6           **MR. MOUNGER:**  Longer ago than I realized.  But a

7     few months ago.  Things have not been going very well for

8     her.  This does not in any way change or diminish her

9     culpability in this.  But she did not acquire a great deal

10    of wealth, accumulate real estate, that I'm aware of, Your

11    Honor.  That also makes her in a poor position to be paying

12    on restitution.  But that is her full intention to begin at

13    the earliest possible time.

14        Now, the Court may -- excuse me.  Her daughter,

15    Karen, is in the courtroom.  She's hoping to finish at

16    Coahoma Community College in May, and hopes to go on into a

17    career of nursing.  And she, from having met her, seems to

18    have some of the caring characteristics that her mother has.

19    She wants to have a career in nursing.  There's no one that

20    her mother knows of to take care of the property; that is,

21    the mobile home that she lives in.  And so she may be having

22    to compute from either Ole Miss, Jackson State, or Delta

23    State.  She feels that the home would be unsafe to leave it

24    unattended for any stretches of time.  So unfortunately, she

25    won't be able to have the experience, it seems, of a

1   residential student.  But that is her intention, for her

2   daughter to carry on a career of service to her community.

3   And Ms. Lofton is doing that up to this date herself, is

4   helping people in their homes, and providing light nursing

5   assistance.  Not RN-type work, but just helping them as best

6   she can.

7          Your Honor, that's all I can say.  I tried to put

8   her situation as best I could from a legal perspective in my

9   Sentencing Memorandum, and just hope the Court will see fit

10  to sentence her at the low end of the range before granting

11  the motion of the government to give her a sentence that

12  allows for a downward departure.

13          That's all.  Thank you.

14          **THE COURT:**  I have some more questions.  But

15  Mr. Dabbs, I'll let you speak first, if you'd like.  Do you

16  have anything?

17          **MR. DABBS:**  I don't have anything to add at this

18  point, Your Honor, unless the Court has questions.

19          **THE COURT:**  I do.

20          Ms. Lofton, you owned Zion, as best I can tell, for

21  about three years -- three and a half years, close to four

22  years, something like that?

23          **THE DEFENDANT:**  From 2012 till the end of 2014.

24          **THE COURT:**  How many employees did Zion have, the

25  most number at any given time?

36

1      **THE DEFENDANT:**  The most we had was 35 to 40.

2      **THE COURT:**  35?

3      **THE DEFENDANT:**  Yes.

4      **THE COURT:**  And what is the least number, like when

5  you first started?

6      **THE DEFENDANT:**  When we started, five.

7      **THE COURT:**  Now, you did pay yourself, did you not?

8      **THE DEFENDANT:**  Yes.

9      **THE COURT:**  What did you pay yourself as a monthly

10  income, gross or net?

11      **THE DEFENDANT:**  It was $23 dollars an hour.  So I'm

12  guessing about $4,000 a month, something like that.

13      **THE COURT:**  Your gross amount, before taxes?

14      **THE DEFENDANT:**  Yes.

15      **THE COURT:**  Now, I've learned, based on my reading

16  of the presentence report about a live discharge rate.  You

17  know what that is, right?

18      **THE DEFENDANT:**  Uh-huh.

19      **THE COURT:**  And I understand from the presentence

20  report that Zion had a 98.32 percent live discharge rate

21  when the national average was between 20 to 30 percent.

22      **THE DEFENDANT:**  Uh-huh.

23      **THE COURT:**  Did you know about the national average

24  at the time?

25      **THE DEFENDANT:**  No, not at the time I didn't.

37

1       **THE COURT:**  There was nothing that raised some

2   eyebrows to you about Zion's live discharge rate at the

3   time?

4       **THE DEFENDANT:**  No.

5       **THE COURT:**  Before Zion, you worked as a billing

6   clerk for Angelic Hospice for a year?

7       **THE DEFENDANT:**  Yes.

8       **THE COURT:**  Did any of those duties include

9   Medicare or Medicaid billing?

10       **THE DEFENDANT:**  Yes.

11       **THE COURT:**  What specifically did you do?

12       **THE DEFENDANT:**  I would just bill -- the owners

13   would bring in the paperwork, and it depends on how many

14   days they were at home, I would bill up from there.

15       **THE COURT:**  So were you relying on -- and let me

16   make sure I'm -- was it a situation where you would take

17   whatever was in paperwork and enter it into a computer or

18   did you make some decisions about how Medicaid or Medicare

19   should be billed?

20       **THE DEFENDANT:**  No, no.  She would give me the

21   paperwork on what to bill, the days, and I would bill.  I

22   had no decision to make on what went in the bill.

23       **THE COURT:**  Now, why did that position end?

24       **THE DEFENDANT:**  They terminated me.

25       **THE COURT:**  Why did they terminate you?

38

1      **THE DEFENDANT:**  I don't know why.  I came to work

2  from vacation that Monday, and I was told that my service

3  was no longer needed.

4      **MR. DABBS:**  Your Honor, can I add one thing to

5  that?

6      The Court may already know this.  But Regina King

7  was the owner of Angelic Hospice.  We actually prosecuted

8  her for hospice fraud, and she was sentenced several years

9  ago in front of Judge Mills.  So she actually was one of the

10  first people we prosecuted for this.  And that was Angelic

11  Hospice.

12      **THE COURT:**  Okay.

13      Is it correct that you decided to open Zion after

14  you were released from Angelic Hospice?

15      **THE DEFENDANT:**  Well, actually, I was trying to

16  open up Zion while I was working, you know, for her.  I was

17  just waiting on -- the survey enough to come out.[sic]  I

18  needed income to pay rent and stuff like that.

19      **THE COURT:**  Okay.  Was she aware that you were

20  trying to open Zion while you were working for her?

21      **THE DEFENDANT:**  Yes.  Uh-huh.

22      **THE COURT:**  Was that based upon -- did you see that

23  you -- were you inspired, rather, to open Zion based on how

24  you saw she was operating Angelic Hospice?

25      **THE DEFENDANT:**  No.  Because I worked for several

1  hospices even before her.

2          **THE COURT:**  Oh, okay.

3          And I wanted to backtrack a little bit with you

4  with respect to your employment history.  So you worked

5  about a year as a bookkeeper for Healing Hands Hospice, I

6  saw.

7          **THE DEFENDANT:**  Yes.

8          **THE COURT:**  Did any of your dealings there include

9  Medicare or Medicaid billing?

10          **THE DEFENDANT:**  Yes.

11          **THE COURT:**  In the same manner as when you worked

12  at Angelic Hospice?

13          **THE DEFENDANT:**  Yes.  Yes.

14          **THE COURT:**  Now, why did the position at Healing

15  Hands Hospice end?

16          **THE DEFENDANT:**  Well, she found out that I was

17  trying to open up my own business.  And so she said that

18  would be a conflict of interest, and she asked me to leave.

19          **THE COURT:**  Mr. Dabbs, did we have anybody as --

20  with Healing Hands?

21          **MR. DABBS:**  We have not prosecuted anybody

22  associated with Healing Hands.  That's definitely a name

23  that I've heard of.

24          **THE COURT:**  Okay.

25          **MR. DABBS:**  But we haven't prosecuted anybody.

40

1        **THE COURT:**  And then I saw you worked, Ms. Lofton,

2  about four and a half years as a bookkeeper for MidSouth

3  Hospice.

4        **THE DEFENDANT:**  Yes.

5        **THE COURT:**  So same questions.  Did your dealings

6  there deal with Medicare and Medicaid billing?

7        **THE DEFENDANT:**  Yes.

8        **THE COURT:**  In the same manner as you did for

9  Angelic and Healing Hands?

10       **THE DEFENDANT:**  Yes, Your Honor.

11       **THE COURT:**  Why did that position end?

12       **THE DEFENDANT:**  She closed the business.

13       **THE COURT:**  Who was the owner of that?

14       **THE DEFENDANT:**  Mary Williams.

15       **THE COURT:**  And then I saw that you worked as an

16  audit review clerk for Isle of Capri Casino.  You were there

17  for just two months.  What happened there?

18       **THE DEFENDANT:**  I had a new born child and -- my

19  daughter, and I was taking care of my father as well.  And

20  it just got too much.

21       **THE COURT:**  And then the last -- well, actually, I

22  got a couple of others things to ask you about.  So you

23  worked as an accounts payable clerk for Memphis Jewish

24  Homes.  Why did that position end?

25       **THE DEFENDANT:**  When I moved back from Chicago, I

41

1  got a job at the Memphis Jewish Home, and driving from

2  Clarksdale to and from every day.

3         **THE COURT:**  Okay.  Now, your title, as I understand

4  from the presentence report, was accounts payable clerk.  Is

5  that right?

6         **THE DEFENDANT:**  Yes.

7         **THE COURT:**  What, specifically, did you do as

8  accounts payable --

9         **THE DEFENDANT:**  Pay the bills, print out checks,

10 anything relatable to accounts payable.

11        **THE COURT:**  And you may have answered this before

12 at least anticipated I was going to ask you.  So that

13 position just lasted from September to December of 1998?

14        **THE DEFENDANT:**  Yes.

15        **THE COURT:**  Why was that so short?

16        **THE DEFENDANT:**  Because at that time, driving from

17 Clarksdale took up a lot of every day.

18        **THE COURT:**  And then you're currently self-employed

19 as the owner of and operator of Compassionate Hands.  Is

20 that right?

21        **THE DEFENDANT:**  Yes, Your Honor.

22        **THE COURT:**  That's a home health company?

23        **THE DEFENDANT:**  Yes.  It's through Medicare.  We

24 have personal care services where we go out and assist the

25 client with bathing, cooking, cleaning the household, doing

42

1    laundry, helping them take their med's, grocery shopping for

2    them.

3            THE COURT:  And you've been doing that since June

4    of 2015?

5            THE DEFENDANT:  Yes, Your Honor.

6            THE COURT:  And what's your monthly gross or net

7    income there?

8            THE DEFENDANT:  Right now, it's $1,600 a month.

9            THE COURT:  Gross, before taxes?

10           THE DEFENDANT:  Yes, Your Honor.

11           THE COURT:  And you are the -- how many employees

12   do you have there?

13           THE DEFENDANT:  Two.

14           THE COURT:  Yourself and -- or is it two other than

15   yourself?

16           THE DEFENDANT:  Two others and myself.

17           THE COURT:  And then what are your typical work

18   days?

19           THE DEFENDANT:  I have a client that goes to day

20   care -- adult day care.  And I visit his house about 6:30 in

21   the morning to get him bathed, up, dressed, take his blood

22   sugar, give him his med's, cook him something to eat.  In

23   the meantime, doing his household chores, so he could be

24   ready about 8:30.  And then I leave from there, and I have

25   four more clients that I see on the same day.  And then he

43

1    comes home in the evening time about 4 o'clock.  I go at

2    4 o'clock in the evening to change him -- you know, to get

3    him prepared for bed.

4          **THE COURT:**  Now, given your present clients, do you

5    work on weekends with them?

6          **THE DEFENDANT:**  I work seven days a week.

7          **THE COURT:**  And then the other two employees you

8    have, they help in that regard, too.  They will go to homes

9    and do the things that you're doing as well?

10         **THE DEFENDANT:**  Yes.  One client works Monday

11   through Friday, and the other client works Wednesday through

12   Friday, and Saturday.

13         **THE COURT:**  You said "client."  You mean employee?

14         **THE DEFENDANT:**  Yes.  Yes.  I'm sorry.

15         **THE COURT:**  Now, who handles the billing of

16   Compassionate Hands?

17         **THE DEFENDANT:**  I do.

18         **THE COURT:**  And do you have any assistance?

19         **THE DEFENDANT:**  No, Your Honor.  With the new

20   Medicaid system, it's, like, a little key that attach to the

21   client's refrigerator.  It's something you can -- you write

22   their number down.  And then when you're done -- it's a set

23   amount that they give.  Like, he gets four hours a day, two

24   in the morning and two in the evening.  When I'm done, I

25   write that number down.  And then at the end of the day,

44

1    when I get home, I call my those numbers in, and they know

2    what time that I was there.

3         THE COURT:  So there are -- it's pretty regimented.

4    So they know when you come, when you leave, and you've got

5    that key.  So there's no question about you providing the

6    services.

7         THE DEFENDANT:  Yes, Your Honor.

8         THE COURT:  Let me go back to Zion for a second.

9    Was there ever any type of auditing that went on while you

10   were owner?

11        THE DEFENDANT:  No.  Because I really had -- I was

12   surveyed in September of 2012.  Therefore, I could start

13   billing.  I couldn't -- I had a problem trying to get the

14   billing system, you know, correct.  So I didn't get my first

15   payment until February of 2013.  Well, I was in business,

16   you know, a good year.  And I did have a CPA, you know, to

17   do my tax return.  But then at the end of 2014 is when, you

18   know, they stopped, you know, my payments.

19        THE COURT:  Okay.

20        THE DEFENDANT:  So really I don't bill -- I wasn't

21   able to bill a little over a year.

22        THE COURT:  I see.

23        Your counsel mentioned your daughter who is in the

24   courtroom today.  She attends Coahoma Community College.  Am

25   I correct that she does not stay on campus?

45

1      **THE DEFENDANT:**  No, no, no.  She stays at home.

2      **THE COURT:**  And I understand that you're married

3  but separated from her father.  Does he financially assist

4  or support her in any way?

5      **THE DEFENDANT:**  Absolutely not.

6      **THE COURT:**  Has he ever?

7      **THE DEFENDANT:**  When we were together.

8      **THE COURT:**  Has she ever lived with anyone else but

9  you?

10     **THE DEFENDANT:**  No.  She's only lived with me.

11     **THE COURT:**  Do you have family or anyone that would

12  be able to -- and I know she's 18, so she's not a child.

13  But at the same time, she still needs some parental

14  assistance and support.  Is there anyone else that can

15  provide that assistance, other than yourself?

16     **THE DEFENDANT:**  Well, my sister in Chicago said she

17  would do what she can.  And a neighbor of mine -- which I

18  knew her all my life; she stays over there -- she would do

19  what she can for her.

20     **THE COURT:**  And no one else lives at the mobile

21  home except for you and her?

22     **THE DEFENDANT:**  And her two dogs.

23     **THE COURT:**  Okay.

24     Now, this unhabitable home that your counsel

25  mentioned, tell me about that.  What's going on with that?

46

1          **THE DEFENDANT:**  I was in the process of remodeling

2    my home -- I'm living in my sister's mobile home now.  I was

3    in the process of remodeling my house when they stopped my

4    funding from the hospice.  So I hadn't been able to finish

5    it.

6          **THE COURT:**  Do you have to pay anything to live in

7    the mobile home?

8          **THE DEFENDANT:**  No.

9          **THE COURT:**  Is it your mobile home?

10         **THE DEFENDANT:**  It's my sister's mobile home.  It's

11   like 26 years old, so....

12         **THE COURT:**  And is it where -- it's -- it's sited

13   on property that belongs to you?

14         **THE DEFENDANT:**  Yes.

15         **THE COURT:**  And the uninhabitable home, is that the

16   home that's at 340 Lone Oak Street?

17         **THE DEFENDANT:**  Yes, Your Honor.

18         **THE COURT:**  I'm going to ask you a couple of

19   questions then about your financial situation.  I see in

20   reviewing the presentence report that you have 64,000 in

21   student loans.

22         **THE DEFENDANT:**  Uh-huh.

23         **THE COURT:**  Now, is that all from your DeVry

24   attendance?

25         **THE DEFENDANT:**  Yes.

1          **THE COURT:**  That's a lot.  How long did you attend

2     DeVry?

3          **THE DEFENDANT:**  Well, I started out, like, as I

4     left college in Chicago.  And then I started back about

5     2009, 2010.

6          **THE COURT:**  Were you making some payments on that

7     loan?  I did see that there was a $117 loan payment for

8     student loans.  Is that what you pay on the --

9          **THE DEFENDANT:**  Well, the first loan I got, I paid

10    it off.  And then I started back over again.  I'm in the

11    process of getting forbearance -- a forbearance.

12         **THE COURT:**  But you've reviewed the information

13    about your finances in your presentence report?  You've had

14    the chance to review that?

15         **THE DEFENDANT:**  Yes.

16         **THE COURT:**  Is all that accurate --

17         **THE DEFENDANT:**  Yes.

18         **THE COURT:**  -- the best you can tell?

19         **THE DEFENDANT:**  Uh-huh.  Yes, ma'am.  Yes.

20         **THE COURT:**  And actually, this may be a question

21    for -- I don't know.  But I'm going to ask it, and whoever

22    can answer it, they can do so.  I'll tell you, Ms. Lofton,

23    that the Court is going to order restitution in your case.

24    It's a great deal of restitution, based upon the number that

25    I provided earlier that I got from the presentence report.

1    It's, like, 2.2 million dollars.  It's a lot of money.

2    Which is why the Court is certainly interested in your

3    financial status, and what you can earn, what you have

4    saved, and what your assets are.  But my question to the

5    room at this point is, I was curious that given the

6    allegations of the indictment charging a conspiracy and that

7    such thing, that there's not been a -- anything saying at

8    that her restitution order should be joint and several with

9    anyone.  So, talk to me about that.

10    **MR. DABBS:**  Your Honor, the government's position

11    would be that you certainly could make it joint and several

12    with Dr. Nelson, if the Court chose to do that, for the

13    billing that he made that's in that 2.2 million.

14    **THE COURT:**  Okay.  Do we know what that is?

15    **MR. DABBS:**  It's going to be --

16    **THE COURT:**  I guess it would be all, since he was

17    her -- he was the only medical director she had.  Right?

18    **MR. DABBS:**  Well, there's Dr. Blackwell --

19    **THE COURT:**  Oh.

20    **MR. DABBS:**  -- who was included in the 2.2

21    million --

22    **THE COURT:**  Okay.

23    **MR. DABBS:**  -- who was prior to Dr. Nelson.  And so

24    I believe the number for Dr. Nelson was around 1.4 million

25    that he -- his certifications generated the payments from

1   Medicare.  As far as the Brandon defendants, they would not

2   have had anything to do with --

3          **THE COURT:**  With her, yeah.

4          **MR. DABBS:**  -- what she was doing.  So I would say

5   that wouldn't be appropriate to make it joint and several

6   with them.  But you certainly can do that with Dr. Nelson.

7          **THE COURT:**  Well, no, I agree.  I agree with you

8   about that.

9          The 1.4 million that you mentioned, I don't know,

10  it may have been mentioned in the presentence report.  Maybe

11  not.

12         **MR. DABBS:**  I think the only thing in the

13  presentence report is the total --

14         **THE COURT:**  Uh-huh.

15         **MR. DABBS:**  -- 2.2.

16         **THE COURT:**  Okay.  You fairly certain about the

17  1.4?

18         **MR. DABBS:**  Yes, Your Honor.  Yes, Your Honor.  And

19  I can get you the exact number.

20         **THE COURT:**  Okay.

21         **MR. DABBS:**  I believe you can hold the restitution

22  determination open --

23         **THE COURT:**  Uh-huh.

24         **MR. DABBS:**  -- for 90 days after sentencing, if you

25  would like to get an exact number of what his certifications

50

1  generated, I can certainly get you that.  It's going to be

2  in the neighborhood of 1.4 million.

3          **THE COURT:**  Okay.

4          What about -- Ms. Lofton, do you have any expenses

5  associated with your daughter's attendance at college?  Are

6  you paying anything as far as tuition is concerned?

7          **THE DEFENDANT:**  No.  But she was able to receive

8  grant money.  I pay for some of her books; you know, gas on

9  a vehicle, her uniforms, lunch money.

10          **THE COURT:**  Okay.  And that that you're speaking

11  of, is that included in these figures --

12          **THE DEFENDANT:**  No.

13          **THE COURT:**  -- in the presentence report?

14          **THE DEFENDANT:**  No.

15          **THE COURT:**  What about monthly does that come to?

16          **THE DEFENDANT:**  It's about $50 a week.

17          I would say anywhere from 2- to $400.

18          **THE COURT:**  Okay, anything else that either you or

19  your counsel think that the Court needs to take into

20  consideration, either about your financial status, about the

21  underlying circumstances, anything that you think of maybe

22  that I asked you earlier that you now want to add to?

23          **MR. MOUNGER:**  I don't believe so, Your Honor.

24          **THE COURT:**  Okay.

25          You know, as to the joint and several with

51

1    Dr. Nelson, I guess it could be contingent, if nothing else.

2         **MR. DABBS:**  Contingent on the figure that the Court

3    determines if he continues or is convicted later, whatever

4    Dr. Nelson is liable to, you could certainly do that.

5         **THE COURT:**  Ms. Lofton, I'll tell you the

6    impression that I got from reading the presentence report is

7    that all of this seems pretty much out of character for you.

8    You have an absolutely clean record before your conviction

9    in this case.  You don't even -- you didn't even have a

10   speeding ticket.  There is absolutely nothing criminal in

11   your past before this conviction.  Of course, here you

12   participate in conspiracy to defraud Medicare by submitting

13   fraudulent crimes over roughly a two to three-year period.

14   Your criminal conduct in this case caused the loss of over

15   2. -- caused or contributed to the loss of over 2.2 million

16   in Medicare, which deprived that program of essential funds

17   that could and should have been spent on deserving others.

18   Your conduct showed complete disregard to those who actually

19   do need hospice care during their last days on this earth.

20   Your counsel has spoken about the reason that you got

21   involved in this hospice care business, because you had that

22   sense of compassion.  And I'll ask you to just think about

23   what that money that was used on patients who were not

24   deserving of hospice care could have been spent towards

25   those who were deserving of hospice care.  Now, I don't

52

1   believe that the government left anybody, you know, without.

2   But it's just the fact of the matter that that is a

3   substantial sum of money that could have been kept in the

4   coffers of Medicare and certainly being used for something

5   else or gone to something that was deserving, and it was

6   not.

7           Now, of course, you have three codefendants in this

8   case.  You told me that you didn't know two of them at any

9   point; had never heard of them before this case, but you did

10  know Dr. Nelson.  And we went through in detail; you

11  answered my questions about how you came to know him, and

12  your relationship with him -- your business relationship and

13  all of that.  So I appreciate that.  It is certainly very

14  helpful to the Court.

15          The Court has also taken into account that you are

16  54-years-old.  Is that is correct?

17          **THE DEFENDANT:**  Yes, ma'am.

18          **THE COURT:**  You're a high school graduate.  You

19  have -- let's see.  You didn't complete your accounting

20  degree; is that correct, from DeVry.

21          **THE DEFENDANT:**  Three years of college.

22          **THE COURT:**  Three years.  But you didn't get your

23  accounting degree?

24          **THE DEFENDANT:**  No.

25          **THE COURT:**  Okay.  Even with those substantial

53

1  amount of loan, you don't have that degree?

2     **THE DEFENDANT:**  Uh-uh.

3     **THE COURT:**  You know, this was a bit conflicting

4  for the Court in the sense that it seems that your

5  personality having -- and I haven't had any opportunity to

6  have any long conversations with you.  This is probably the

7  longest that we've had.  But given that I took your plea,

8  and after speaking with you today, it seems like you -- and,

9  of course, looking at the fact that you had no prior

10  criminal history at all, as I said before, it seems out of

11  character.  I have to always, when I approach these

12  sentencings, look at what I think are the negatives and the

13  positives.  The positives that I saw were some of the things

14  I mentioned before that you had no prior criminal history.

15  I also thought, and I was surprised when you said that the

16  maximum number of people you employed was 35, which I didn't

17  think it would be that great.  I think that is commendable

18  in the sense that you were employing that many people in the

19  Mississippi Delta where jobs are really, really hard to come

20  by.  Unfortunately, that benefit has been negated by your

21  crime in this case.

22     I know, of course, that your conviction, and

23  particularly based upon the sentencing memorandum your

24  counsel submitted, it has diminished your standing and

25  reputation in your own community, and that's something that

1   you're just going to have to live with.  It certainly has

2   had some effect, I'm sure, on your family.  Your counsel has

3   spoken about your daughter here, and I think that that is a

4   concern.  I do often tell defendants that even though I --

5   you have done something that is affecting you directly, it

6   has all these indirect repercussions on your family and

7   other things.  And so it is unfortunate in that regard.

8          As your counsel pointed out, despite the large

9   amount of loss here, you just don't have that much to show

10  for your current financial situation.

11         You said you were paying yourself about $4,000 a

12  month before taxes?

13         **THE DEFENDANT:**  For the hospice.

14         **THE COURT:**  From your hospice business, yes.

15         **THE DEFENDANT:**  Yes.

16         **THE COURT:**  I take it that you just had expenses

17  that did not allow you to save anything.  Is that what

18  happened?

19         **THE DEFENDANT:**  Well, I did have a little savings.

20  When they stopped my funds coming out, I couldn't pay

21  myself.  From January 2015 up until I got this new business

22  going, I lived off my savings.  But that's been long gone.

23         And the reason I paid myself only $4,000 a month, I

24  didn't want to feel that I'm -- being the only CEO, that I

25  was being greedy.

1    **THE COURT:**  I understand.  What is the most amount

2    of money that -- what is the highest amount of money that

3    any of your employees made?

4    **THE DEFENDANT:**  Actually, the nurses' salary was

5    more than mine, the RN and LPN.  The RNs, at that time, was

6    paid $32 an hour.  The LPN, $25; the CNA, $12.

7    **THE COURT:**  Of course, I also take into account the

8    fact that you are your sole provider for your daughter.

9    Also, that -- again, this is why I was conflicted about

10   this, you have absolutely no substance abuse in your

11   background, you know, nothing.  You certainly have been

12   compliant with all of your bond conditions.  So, you know,

13   it's -- I mean, looking at these positive things about you

14   and then seeing the reasons why we're here today.

15       Your calculated guideline ranges include a term of

16   imprisonment of up to 46 months and eligibility for one to

17   three years of probation.  The statutory penalties, on the

18   other hand, include a term of imprisonment of up to 10 years

19   and authorized probation for one to five years.

20       You are the first defendant in this case to come

21   before the Court for sentencing.  And as you can tell, I

22   have looked at as much as I could that has been submitted to

23   me, including the presentence report.  I've definitely read

24   all of the reference letters that have been submitted on

25   your behalf, everything that your counsel has said in a

1    Sentencing Memorandum.  And sometimes I never know how I'm

2    going to rule.  Well, I have an idea about how I'm going to

3    rule as to sentencing.  Sometimes I go into a sentencing

4    where I'm conflicted about how I'm going to rule.  I did

5    enter this one with some conflict about what I thought would

6    be an appropriate sentence for you given all of the things

7    that I have mentioned here today.  So what I think I am

8    going do is I'm going to continue your sentencing.  It will

9    be set for a time that we will come up with that you and

10   your counsel can -- when your counsel is available.  I'll

11   tell you why I want to do that.  There are numerous reasons,

12   but primarily, one, I want to get a hold on specifically --

13   I know the government is correct, I can hold this judgment

14   open for 90 days with respect to any amount of restitution

15   that I find to be jointly and severally -- should be jointly

16   and severally imposed with regard to Dr. Nelson.  I can do

17   that.  But I would rather have a firm figure for that.  And

18   then also, frankly, Ms. Lofton, I -- I just really want to

19   give it some more study.  There are a lot of factors in play

20   here, and I certainly know -- that I want you to know that I

21   don't take lightly my job in sentencing anyone, not just

22   you.  But I think for the Court's satisfaction, I want to

23   not make that decision today.  So I'm going to continue your

24   sentencing.  I will get together with your counsel and we

25   will figure out a day to continue.  It won't be long down

57

1  the road.  There are just a few other things I'd like to

2  think about.

3          Your present job, you said you work seven days a

4  week.  Is that right?

5          **THE DEFENDANT:**  Yes.  The reason I work seven days

6  a week -- I have two other workers, but I have a total of 10

7  clients.  But I do five clients myself so that I can keep

8  the money.

9          **THE COURT:**  So someone else is filling in for you

10  today, and they are getting paid the money you would be

11  making?

12          **THE DEFENDANT:**  Yes.

13          **THE COURT:**  Is that right?

14          **THE DEFENDANT:**  Yes.

15          **THE COURT:**  Well, I apologize for taking you away

16  from that without coming to some finality about your

17  sentence today.  I tend to be cautious with certain things

18  that just don't sit right with me.  And this is one of

19  those.  And I would prefer to just give some more thought to

20  it before I announce your sentence.  So, with that, I'm

21  going to continue your sentence to a point that would be

22  determined based upon the notice we will file.  We will

23  check with Mr. Mounger and with Mr. Dabbs about when that

24  will be.  And so you will come back then, and I will

25  pronounce your sentence then.  And then frankly, I was

58

1    prepared to do it today but I -- given some of the

2    discussions we've had today, I prefer to wait.

3          So your sentencing is continued until further

4    notice.  I will see you at the time when we reset it.

5          Thank you.

6          **MR. MOUNGER:**  Thank you, Your Honor.

7          **THE COURT:**  Uh-huh.

8          **MR. DABBS:**  Thank you, Your Honor.

9                    (Recessed:  3:22 P.M.)

10                   <u>CERTIFICATE</u>

11     I, Brenda D. Blackburn, Federal Official Court Reporter,

12   in and for the United States District Court for the Northern

13   District of Mississippi, do hereby certify that pursuant to

14   Section 753, Title 28, United States Code, that the

15   foregoing 57 pages are a true and correct transcript of the

16   stenographically reported proceedings held in the

17   above-entitled matter and that the transcript page format is

18   in conformance with the regulations of the Judicial

19   Conference of the United States.

20     Witness my hand, this <u>29th</u> day of June, 2020.

21

22            /s/Brenda D. Blackburn
     _____
23            BRENDA D. BLACKBURN, RPR, CCR NO. 1087
              Federal Official Court Reporter

24

25